﻿Citation Nr: AXXXXXXXX
Decision Date: 03/19/19 Archive Date: 03/19/19

DOCKET NO. 181204-1002
DATE: March 19, 2019

ORDER

Entitlement to an increased disability rating in excess of 50 percent prior to August 6, 2015 for PTSD is denied.

Entitlement to an increased disability rating in excess of 70 percent from August 6, 2015 for PTSD is denied.

Entitlement to an increased disability rating in excess of 0 percent disabling for limitation of motion of the ring and little fingers of the right hand is denied.

Entitlement to an increased disability rating in excess of 10 percent disabling for painful and limited motion of the right index finger is denied.

Entitlement to an increased disability rating in excess of 10 percent disabling for painful and limited motion of the right long finger is denied.

Entitlement to an increased disability rating in excess of 10 percent disabling for painful and limited motion of the right thumb is denied.

Entitlement to an increased disability rating in excess of 10 percent for De Quervain’s tenosynovitis of the right wrist is denied.

Entitlement to a 10 percent disability rating for tonsillitis is granted.

Entitlement to an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right index finger is denied.

Entitlement to an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right long finger is denied.

Entitlement to an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right thumb is denied.

Entitlement to service connection for sinusitis is denied.

REMANDED

Entitlement to service connection for arthritis of the right knee is remanded.

Entitlement to service connection for arthritis of the right knee is remanded.

Entitlement to service connection for right hip strain is remanded.

Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected disabilities prior to August 6, 2015 is remanded.

FINDINGS OF FACT

1. The preponderance of the evidence reflects that prior to August 6, 2015, the Veteran’s service-connected PTSD and resultant symptoms did not cause total occupational and social impairment or occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.

2. The preponderance of the evidence reflects that on and after August 6, 2015, the Veteran’s service-connected PTSD and resultant symptoms did not cause total occupational and social impairment.

3. The preponderance of the evidence reflects that during the period on appeal, the Veteran has had pain in and some limitation of motion of his right ring and little fingers, but there has been no amputation and no ankylosis of those fingers.

4. The preponderance of the evidence reflects that during the period on appeal, the Veteran has had pain in and some limitation of motion of his right index finger, but there has been no amputation and no ankylosis of that finger.

5. The preponderance of the evidence reflects that during the period on appeal, the Veteran has had pain in and some limitation of motion of his right long finger, but there has been no amputation and no ankylosis of that finger.

6. The preponderance of the evidence reflects that during the period on appeal, the Veteran has had pain in and some limitation of motion of his right thumb, but there has been no amputation and no ankylosis of that thumb, and when the Veteran has attempted to oppose that thumb with the fingers on his right hand, there has not been a gap of more than two inches (5.1 cm.) between the thumb pad and the fingers.

7. The preponderance of the evidence reflects that during the period on appeal, the Veteran’s De Quervain’s tenosynovitis of the right wrist has caused some pain in and limitation of motion of his right wrist but not ankylosis of that wrist.

8. The preponderance of the evidence reflects that during the period on appeal, the Veteran’s service-connected tonsillitis has caused inflammation and redness of the Veteran’s tonsils.

9. The preponderance of the evidence reflects that prior to January 22, 2015, the motion of two or more of the Veteran’s service-connected digits on his right hand (right index finger, right long finger, right thumb, right ring and right little finger) was not limited and there was no ankylosis of any of those digits.

10. The preponderance of the evidence weighs against finding that the Veteran has sinusitis that began during active service or is otherwise related to an in-service injury or disease.

CONCLUSIONS OF LAW

1. The criteria for a disability rating in excess of 50 percent prior to August 6, 2015 for PTSD have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9411.

2. The criteria for a disability rating in excess of 70 percent from August 6, 2015 for PTSD have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9411.

3. The criteria for a disability rating in excess of 0 percent disabling for limitation of motion of the ring and little fingers of the right hand have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

4. The criteria for a disability rating in excess of 10 percent disabling for painful and limited motion of the right index finger have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

5. The criteria for a disability rating in excess of 10 percent disabling for painful and limited motion of the right long finger have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

6. The criteria for a disability rating in excess of 10 percent disabling for painful and limited motion of the right thumb have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

7. The criteria for a disability rating in excess of 10 percent disabling for De Quervain’s tenosynovitis of the right wrist have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5214-5215.

8. The criteria for a 10 percent disability rating for tonsillitis have been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.20, 4.27, 4.97, Diagnostic Code 6516.

9. The criteria for an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right index finger have not been met. 38 U.S.C. §§ 1155, 5107, 5110; 38 C.F.R. §§ 3.102, 3.400, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

10. The criteria for an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right long finger have not been met. 38 U.S.C. §§ 1155, 5107, 5110; 38 C.F.R. §§ 3.102, 3.400, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

11. The criteria for an effective date prior to January 22, 2015 for the separate 10 percent disability rating for painful and limited motion of the right thumb have not been met. 38 U.S.C. §§ 1155, 5107, 5110; 38 C.F.R. §§ 3.102, 3.400, 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5216-5230.

12. The criteria for service connection for sinusitis are not met. 38 U.S.C. §§ 1110, 5107; 38 C.F.R. §§ 3.102, 3.303.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Board is honoring the Veteran’s choice to participate in VA’s test program, RAMP, the Rapid Appeals Modernization Program.

The Veteran served on active duty from October 1995 to August 1999. The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form. Accordingly, the September 2018 RAMP rating decision considered the evidence of record as of the date VA received the RAMP election form. In October 2018, the Veteran timely appealed this RAMP rating decision to the Board and requested direct review of the evidence considered by the Agency of Original Jurisdiction (AOJ). As explained in the October 2018 RAMP selection form, “direct review” means that the Board’s decision must be based upon the evidence of record at the time of the prior decision, with no evidence submission or hearing request. As such, the Board has considered only the evidence of record at the time of the September 2018 RAMP decision. 

Increased Rating

The Veteran claims entitlement to increased disability ratings for his service-connected PTSD, limitation of motion of his right ring finger, little finger, index finger, long finger, and thumb, tonsillitis and De Quervain’s tenosynovitis of the right wrist. Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 (2017).

Disability ratings are determined by applying the criteria set forth in VA’s Schedule for Rating Disabilities. Ratings are based on the average impairment of earning capacity. Individual disabilities are assigned separate diagnostic codes. See 38 U.S.C. § 1155; 38 C.F.R. § 4.1. Where entitlement to compensation has already been established, and an increase in the disability rating is at issue, the present level of disability is of primary concern. Although a rating specialist is directed to review the recorded history of a disability in order to make a more accurate evaluation, the regulations do not give past medical reports precedence over current findings. See Francisco v. Brown, 7 Vet. App. 55 (1994); 38 C.F.R. § 4.2. Staged ratings are, however, appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. The relevant focus for adjudicating an increased rating claim is on the evidence concerning the state of the disability from the time period one year before the claim was filed until VA makes a final decision on the claim. See generally Hart v. Mansfield, 21 Vet. App. 505 (2007). Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating; otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7.

1. Entitlement to an increased disability rating in excess of 50 percent prior to August 6, 2015 for PTSD

The Veteran’s PTSD, like all psychiatric disorders, is rated under the General Rating Formula for Mental Disorders. The Veteran’s PTSD is currently rated thereunder as 50 percent disabling prior to August 6, 2015. Under that formula, a rating of 50 percent is warranted for a mental disorder that results in occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 38 C.F.R. § 4.130, Diagnostic Code (Code) 9411.

A rating of 70 percent is warranted for a mental disorder that results in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id. 

A rating of 100 percent is warranted for mental disorders that result in total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id.

Importantly, evaluations under the General Rating Formula for Mental Disorders are symptom-driven, meaning that symptomatology should be the fact-finder’s primary focus when deciding entitlement to a given disability rating under that regulation. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 116-17 (Fed. Cir. 2013). Severity and duration of the symptoms also play an important role in determining the rating. Id. at 117. The Board notes, however, that the list of symptoms under the rating criteria are meant to be examples of symptoms that would warrant the rating and are not meant to be exhaustive. The Board need not find all or even some of the symptoms to award a specific rating. 38 C.F.R. § 4.21; Mauerhan v. Principi, 16 Vet. App. 436, 442-43 (2002). If the evidence shows the Veteran suffers symptoms listed in the rating criteria or symptoms of similar severity, frequency, and duration, that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the criteria for a particular rating, the appropriate equivalent rating will be assigned. Mauerhan, 16 Vet. App. at 443.

In this case, the Veteran claims entitlement to an increased evaluation of his service-connected PTSD because, according to him, his PTSD symptoms have worsened to the point that he now has occupational and social impairment with deficiencies in most areas and is precluded from obtaining and maintaining gainful employment. See, e.g., letter from Veteran’s attorney received in April 2016; letter from Veteran’s attorney received in October 2018. The Board finds that the most pertinent evidence relating to this issue includes the Veteran’s statements, his medical records (i.e., his VA and private treatment records), the reports of the VA PTSD examinations that were performed prior to August 6, 2015, and the report of an April 2013 psychological evaluation of the Veteran in his records from the Social Security Administration (SSA).

The Veteran’s private and VA treatment records collectively show that prior to August 6, 2015, the Veteran suffered from a wide variety of PTSD symptoms that varied in severity; however, there is little indication in those records that the Veteran’s symptoms caused abnormal deficiencies in the Veteran’s work, family relations, judgment, thinking, or mood due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. 

For example, in February 2012, the Veteran denied acute psychological issues and suicidal and homicidal ideations, and he reported that he was stable on his medications. See VA treatment note dated in February 2012. In October 2012 and April 2015, the Veteran reported that he was experiencing anxiety, irritability, hypervigilance, intrusive thoughts, physiological reactivity avoidance, and insomnia, but there was little indication that those symptoms were so severe that they caused deficiencies in most areas of the sort discussed in the criteria for a 70 percent disability rating in the General Rating Formula for Mental Disorders. See VA treatment notes dated in October 2012 and April 2015; see also 38 C.F.R. § 4.130. In January 2013, the Veteran reported feeling calmer and that he was experiencing fewer sleep disturbances. See VA treatment note dated in January 2013. The Veteran’s VA treatment records also contain mention of the fact that he does not have a very close relationship with many others aside from his current spouse, including his children from his previous marriage. However, overall, the Board finds that the Veteran’s VA treatment records reflect that prior to August 6, 2015, his PTSD symptoms were more akin to those discussed in the criteria for a 50 percent disability rating in the General Rating Formula for Mental Disorders than those discussed in the criteria for the 70 percent disability rating therein. 

The Veteran was afforded a VA examination for his service-connected PTSD in September 2011, and the examiner indicated that the Veteran’s PTSD did not prevent him from being able to engage in physical and sedentary forms of employment and that it caused him only occupational and social impairment due to mild or transient symptoms which decrease work efficiency and the ability to perform occupational tasks only during periods of significant stressor symptoms controlled by medication. See Initial PTSD Disability Benefits Questionnaire (DBQ) dated in September 2011. The Veteran was afforded another VA examination in December 2014, and the examiner that performed that examination noted that the Veteran reported that he was terminated from his most recent employment at a chemical company after he was directed by a physician to limit his work to light duty due to a knee condition. The examiner indicated that anxiety and chronic sleep impairment were the only symptoms that actively apply to the Veteran’s PTSD diagnosis. The examiner determined that the Veteran’s PTSD caused him occupational and social impairment with reduced reliability and productivity. See Review PTSD DBQ dated in December 2014.

In the report of the April 2013 psychological examination in the Veteran’s SSA records, the examiner noted that the Veteran was very nicely dressed, but would pause and stare off into the distance for unusually long periods of time after being asked a question and would otherwise act strange and odd when responding to the examiner’s questions. The examiner also noted that the Veteran seemed guarded and seemed to have problems answering questions due to memory deficits, and that he had been divorced once before, drinks and possibly abuses alcohol, and had been arrested and charged with domestic violence, aggravated assault and a DUI. The examiner found the Veteran’s thought processes to be coherent and logical and he reported that the Veteran denied suicidal ideation. However, the examiner also indicated that the Veteran reported that he sees things at times but would not elaborate. In the Summary and Conclusions section of that report, the examiner wrote that the Veteran may meet the criteria for antisocial personality disorder and hinted that some of the Veteran’s behavior may be attributable to that possible diagnosis. The examiner also stated, however, that the behavior that caused the Veteran’s legal problems and alcohol use (and possible abuse) could be a result of his PTSD. The examiner determined that the Veteran was able to understand and follow simple instructions and to perform simple math, the Veteran’s ability to respond favorably to supervision and to interact cooperatively with coworkers was questionable, and his concentration and attention are markedly affected. The examiner then concluded that the Veteran was probably significantly impaired and on that basis unable to perform routine repetitive work-related tasks. See SSA records received in January 2015.

After having reviewed the claims file, including but not limited to all of the aforementioned evidence, the Board finds that the severity of the Veteran’s PTSD prior to August 6, 2015 is best characterized by the criteria for a 50 percent disability rating in the General Rating Formula for Mental Disorders. See 38 C.F.R. § 4.130. None of the reports cited above reflect that the Veteran had obsessive rituals that interfere with his routine activities; that his speech was illogical, obscure or irrelevant; that he suffered from near-continuous depression which affected his ability to function independently, appropriately and effectively; that he had any significantly abnormal impaired impulse control; or that he was spatial disoriented, neglected his personal appearance and hygiene, had any difficulty adapting to stressful circumstances, or was unable to establish and maintain effective relationships. Considering the above, the Board finds that the severity of the Veteran’s PTSD and accompanying symptoms was best approximated by the criteria for a 50 percent evaluation under the General Rating Formula for Mental Disorders. Id. Accordingly, the Veteran is not entitled to an increased disability rating in excess of 50 percent for his PTSD prior to August 6, 2015. The Board notes that it has reviewed and considered the Veteran’s arguments that were submitted by and through his attorney in correspondence received in December 2018, but for the reasons discussed above, and based on the medical evidence of record, the Board does not find a basis for an evaluation in excess of 50 percent prior to August 6, 2015.

2. Entitlement to an increased disability rating in excess of 70 percent from August 6, 2015 for PTSD

The Veteran’s PTSD is currently rated as 70 percent disabling from August 6, 2015 under the General Rating Formula for Mental Disorders.

The Veteran was examined in August 2015 in connection with this instant claim for an increased rating of his PTSD before VA. The examiner reiterated many of the same findings regarding the Veteran’s affect and legal history, this time writing that the Veteran appeared to be sad and was stuttering during the examination. The examiner also indicated that the Veteran’s statements seemed reliable. In the reports of both of these examinations, the examiner indicated that the Veteran mostly kept to himself. According to the examiner, during this second examination, the Veteran reported that he had anxiety attacks daily, which he describes as a 10 in severity on a scale from 1 to 10. The Veteran apparently also reported that he suffered from depression which he characterized as an 8 in severity on a scale from 1 to 10. The examiner wrote that the Veteran reported that if he heard a noise at night, he could not go back to sleep and that he also had suicidal ideations. The examiner also wrote that the Veteran had a history of explosive outbursts and crying spells daily. However, the examiner did also note that the Veteran’s mood and affect were appropriate, that he presented with no psychotic signs or symptoms, and that his thoughts were connected and logical during the evaluation. In the Summary and Conclusions section of this second report, the examiner reiterated his previous findings regarding the Veteran’s ability to understand instructions, perform simple math, respond to supervision and interact with coworkers. The examiner opined that the Veteran’s concentration and attention are markedly affected and that he “would give him an impairment rating of 100%.” See Confidential Psychological Evaluation received in August 2015; Review PTSD DBQ received in August 2015.

The Veteran’s VA treatment records reflect that during a follow up psychiatry appointment in September 2015, he indicated that he was still experiencing PTSD symptoms, especially irritability, but he denied having any suicidal ideation and there was no evidence of psychosis. During that appointment, he told the staff at the VA medical center (VAMC) that he did not want to continue any evidence-based treatment for his PTSD, including psychiatric medication management. His VA treatment records further reveal that although he has continued to treat at the VAMC for other medical conditions, there has been no indication that he was suffering from any significant PTSD symptoms or that his PTSD has been interfering with his work or social life. See VA treatment records received in September 2018. 

The Veteran was afforded another VA examination in July 2017, and the examiner who conducted that examination included a brief discussion of the Veteran’s history which indicated that the Veteran tends to his own personal hygiene without assistance and apparently all of his own daily needs, too, except that his wife cooks for him. The provided history also includes a discussion of the Veteran’s last job and his termination from that job; it indicates that the Veteran lost his job there after he made a mistake and left a valve closed, causing an explosion of a chemical line. He stated that when the employer found out that the Veteran had PTSD, they recommended that he go talk to a doctor, and he was subsequently terminated. However, of note, during that examination, the Veteran stated that he did not feel that he had general work performance problems and during the December 2014 VA examination, he indicated that he was terminated from that job after being put on light duty for a knee condition. The examiner stated that the Veteran displayed a flattened, dysphoric affective demeanor but that his mental status was within normal limits and no other irregularities in his language or behavior were observed. The examiner indicated that the Veteran’s symptoms included a depressed mood, anxiety, near-continuous panic or depression, chronic sleep impairment, mild memory loss, a flattened affect, disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationships and difficulty adapting to stressful circumstances. The examiner opined that the Veteran’s PTSD caused occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood. See Review PTSD DBQ dated in July 2017. 

The only evidence contained in the reports cited above that would tend to support a 100 percent evaluation is the August 2015 examiner’s conclusion that the Veteran’s PTSD warranted a total (100 percent) rating. However, this examiner did not support this conclusion with citation to any of the remaining symptoms included in the criteria for a 100 percent evaluation, and the basis for this conclusion remains unclear. Moreover, this examiner’s determination is substantially at variance with contemporaneous VA treatment records and the report of the July 2017 examination, which revealed symptoms not indicative of an evaluation in excess of 70 percent and contain no suggestion of total occupational and social impairment. Indeed, the July 2017 VA examiner clearly detailed the Veteran’s specific symptoms and found them to cause occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood. This examination report also contains a detailed description of the Veteran’s history. The Board accordingly finds both that this report is the most probative evidence of record, contains conclusions that correspond to the Veteran’s own symptoms, and does not support an evaluation in excess of 70 percent. 

Thus, the preponderance of the evidence weighs against the Veteran’s claim of entitlement to an increased disability rating in excess of 70 percent for his PTSD after August 6, 2015, and that claim is therefore denied. 

3. Entitlement to an increased disability rating in excess of 0 percent disabling for limitation of motion of the ring and little fingers of the right hand

The Veteran’s limitation of motion of the ring and little fingers of the right hand is currently evaluated as 0 percent disabling (i.e., noncompensable) from February 29, 2012 under Diagnostic Code (Code) 5230.

Under Code 5230, a noncompensable disability rating is assigned for any limitation of motion of the ring or little finger; no higher disability ratings are available for limitation of motion either of those fingers. 38 C.F.R. § 4.71a.

Higher disability ratings are available under Codes 5216 through 5227 for disabilities of the finger where ankylosis of one or more digits is present, and higher disability ratings are also available under Codes 5228 and 5229 where limitation of motion of the thumb, index or long fingers is present. Furthermore, if there is limitation of motion of two or more digits, each digit shall be evaluated separately, and the evaluations then combined. 38 C.F.R. § 4.71a, Codes 5216-5230.

The Board finds that the most pertinent evidence relating to this issue includes the Veteran’s statements, his medical records and the VA examination reports pertaining to his hand and fingers that are of record.

At the outset, the Board notes that none of that evidence nor any of the other evidence of record reflects that any of the Veteran’s digits on his right hand have been ankylosed during the period on appeal, thus, the Veteran is not entitled to an increased evaluation under Codes 5216-5227. Additionally, Codes 5228 and 5229 provide the schedular ratings for limitation of motion of the thumb, index and long fingers, and not the ring or little fingers, so the Veteran is not entitled to an increased evaluation under those Codes either. See id.

Furthermore, although the Veteran’s VA and private treatment records do reflect that he has some pain with motion of the digits of his right hand, they do not reflect that the motion of the Veteran’s ring or little finger has been limited during the period on appeal. The Veteran was afforded a VA examination for his right hand condition in June 2012, and according to the report of that examination, the Veteran had residual pain with use of his right small and ring fingers, and potentially his thumb, too, but no limitation of motion of the Veteran’s fingers was mentioned. See Hand and Finger Conditions DBQ dated in June 2012; Medical Opinion 2 DBQ dated in June 2012. The Veteran was afforded another VA examination for his hand and finger conditions in February 2015, and the examiner that performed that examination indicated that the Veteran’s ring finger and little finger range of motion as determined by measurements of the extension and flexion of those fingers were within the normal range as set forth in 38 C.F.R. § 4.71a. Thus, for purposes of this claim, the Veteran did not have any recognizable limitation of motion of those fingers. The examiner also indicated that three views of the Veteran’s right hand (i.e., x-rays of his right hand) were unremarkable. The examiner did indicate, however, that the Veteran again reported pain on use of his fingers and that this pain did cause functional loss after repetitive use and during flare-ups. See Hand and Finger Conditions DBQ dated in February 2015; Medical Opinion DBQ dated in February 2015.

After review and consideration of all of the evidence of record, including but not limited to that discussed above, the Board finds that the most pertinent evidence of record reflects that the Veteran experiences some pain when using his right ring and little fingers but also that the motion of those fingers is not limited. This conclusion is supported by both the Veteran’s private and VA treatment records and the aforementioned VA examination reports. To the extent that the Veteran claims that he does have limitation of the motion of those fingers, the Board finds the aforementioned VA examination reports more probative on that point, as they were completed by third party medical professionals that have no interest in the outcome of this claim and that have more education and experience in assessing the severity of musculoskeletal disorders and the consequent ranges of motion of different joints. Accordingly, the Board finds that the preponderance of the evidence weighs against this claim of entitlement to an increased disability rating in excess of 0 percent disabling for limitation of motion of the Veteran’s ring and little fingers of his right hand, and, therefore, this claim must be denied.

The Board notes that it has considered the applicability of 38 C.F.R. § 4.59 to this issue; that regulation provides that it is VA’s intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. In this case, the record does reflect that the Veteran has pain on movement of his ring and little fingers, but there exists no minimum compensable rating for the ring and little fingers; rather, the highest rating based on motion is 0 percent. Accordingly, even considering 38 C.F.R. § 4.59, the Veteran is not entitled to a compensable rating (i.e., a rating in excess of 0 percent) for his ring and/or little finger disabilities.

4. Entitlement to increased disability ratings in excess of 10 percent disabling for painful and limited motion of the right index finger, painful and limited motion of the right long finger, and painful and limited motion of the right thumb

The Veteran’s painful and limited motion of his right index finger and his painful and limited motion of his right long finger are each currently evaluated as 10 percent disabling from January 22, 2015 under Code 5229; his painful and limited motion of his right thumb is also currently evaluated as 10 percent disabling from January 22, 2015, but it is evaluated as such under Code 5228.

Prior to January 22, 2015, the Veteran’s painful and limited motion of his thumb, index and long fingers were evaluated collectively as 10 percent disabling under Code 5228.

Under Code 5229, a disability rating in excess of 10 percent is not available for limitation of motion of the index or long finger.

Under Code 5228, a 20 percent disability rating is the highest rating available for limitation of motion of a thumb, and that rating is available where there is a gap of more than 2 inches, or 5.1 cm., between a veteran’s thumb pad and fingers when the thumb attempts to oppose the fingers. A 10 percent disability rating is to be applied where such a gap measures one to 2 inches, or 2.5 to 5.1 cm.

As mentioned above, higher evaluations are available where there is ankylosis of one or more affected digits, but as also mentioned above, the claims file does not contain any evidence of any such ankylosis of the Veteran’s service-connected right digits during the period on appeal.

As mentioned above, the Veteran’s VA and private treatment records do reflect that he has some pain with motion of the digits of his right hand, but they do not reflect that the motion of his right thumb has been limited to the point that there has been a gap of more than 2 inches or 5.1 cm. between his right thumb pad and fingers when he has attempted to oppose his thumb to his fingers during the period on appeal. Nor do they indicate that the Veteran has had any other symptoms or functional loss due to his service-connected right hand, finger and thumb disabilities other than pain, some limitation of motion and a weakened grip. The same is true of the relevant VA examination reports that are in the record and discussed above. See Hand and Finger Conditions DBQ dated in June 2012; Medical Opinion 2 DBQ dated in June 2012; Hand and Finger Conditions DBQ dated in February 2015; Medical Opinion DBQ dated in February 2015. Here again, to the extent that the Veteran contends that he suffers from any additional limitation of motion of his right thumb, index or long fingers or any additional symptoms resulting from his in-service right hand injury, the Board finds that the VA examination opinions are of greater probative value than any such contentions by the Veteran for the same reasons as discussed above. 

Therefore, after review of the claims file, including but not limited to the evidence set forth above, the Board finds that the preponderance of the evidence of record weighs against the Veteran’s claims of entitlement to increased disability ratings in excess of 10 percent disabling for his service-connected painful and limited motion of his right index finger, right long finger, and right thumb during the period beginning on and after January 22, 2015.

The Board notes that the issues of whether the Veteran’s separate 10 percent disability ratings for his service-connected right index finger, right long finger, and right thumb should have been granted with an effective date prior to January 22, 2015 will be addressed below in the Effective Date section.

5. Entitlement to an increased disability rating in excess of 10 percent for De Quervain’s tenosynovitis of the right wrist

The Veteran’s service-connected De Quervain’s tenosynovitis of his right wrist is currently rated 10 percent disabling under Code 5215.

Code 5215 pertains to limitation of motion of the wrists. Under this Code, limitation of motion of a wrist is to be assigned a 10 percent evaluation where dorsiflexion of the wrist is limited to less than 15 degrees or where palmar flexion of the wrist is limited in line with the forearm. Higher disability ratings are available under Code 5214 where there is ankylosis of a wrist.

The Board finds that the most pertinent evidence in the claims file that relates to this issue is comprised of the Veteran’s medical records and the relevant VA examination reports of record (i.e., a July 2015 Wrist Conditions DBQ and a June 2017 Medical Opinion DBQ).

Neither his VA nor his private treatment records reflect any significant and persistent symptomatology of his service-connected right wrist disability other than limitation of motion of that wrist and pain in the wrist. Further, none of the Veteran’s medical records and none of the relevant VA examination reports of record indicate that he has ankylosis of the wrist. In fact, the June 2015 Wrist Conditions DBQ affirmatively and explicitly states that the Veteran did not have ankylosis of his service-connected right wrist at the time of that examination. The June 2017 Medical Opinion DBQ indicates that painful flares of the Veteran’s right wrist condition result in a reduced range of motion of the wrist. The Veteran has stated that his wrist bothers him and that the motion of his wrist is decreased, but he has not stated that he has ankylosis of the wrist or any other symptoms related to this disability. See, e.g., VA Form 27-0820, Report of General Information dated in June 2015; VA Form 21-0958, Notice of Disagreement (NOD) received in August 2015. To the extent that he does contend that he has ankylosis of his right wrist or any other symptoms relating to the wrist other than pain and limitation of motion, the Board finds that the aforementioned DBQs are of greater probative value on those points, since they were completed by medical professionals that have a higher level of education and experience in determining the severity and etiology of different symptoms and the ranges of motion of different joints.

Accordingly, the Board finds that the preponderance of the evidence weighs against this claim of entitlement to an increased disability rating in excess of 10 percent for De Quervain’s tenosynovitis of the right wrist, and the claim is therefore denied.

6. Entitlement to an increased disability rating in excess of 0 percent disabling for tonsillitis

The Veteran’s service-connected tonsillitis is currently evaluated as noncompensable under Code 6599-6516. Hyphenated diagnostic codes are used when a rating under one diagnostic code requires use of an additional diagnostic code to identify the basis for the evaluation assigned; the additional code is shown after the hyphen. 38 C.F.R. § 4.27. The use of “99” denotes an unlisted disability (unlisted disabilities rated by analogy are coded first by the numbers of the most closely related body part and then “99”). 38 C.F.R. §§ 4.20, 4.27. Thus, in this case, the Veteran’s service-connected tonsillitis has been rated under Code 6599-6516 as analogous to laryngitis, and Code 6516 is the Code identifying the basis for the noncompensable evaluation assigned. 

Under Code 6516, hoarseness with inflammation of the cords or mucous membrane warrants a 10 percent rating. Hoarseness with thickening of nodules of cords, polyps, submucous infiltration, or pre-malignancy changes on biopsy warrants a 30 percent rating.

The Board finds that the most pertinent evidence relating to this issue is comprised of the Veteran’s medical records and the relevant VA examination reports of record (e.g., the June 2012 Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ and the December 2014 Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ).

The Veteran’s medical records reflect that during the period on appeal, he has complained of symptoms such as nasal congestion, a post nasal drip, chest congestion, fever, fatigue, a scratchy throat, chills, body aches, coughs and an upset stomach on several occasions. He has been assessed as having sinusitis, bronchitis, rhinitis and pharyngitis but not tonsillitis during the visits relating to and in which he complained of those symptoms. In the June 2012 Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ (Sinusitis DBQ) the examiner wrote that the Veteran indicated that he continues to have flare ups of similar symptoms at least 8-12 times per year. The December 2014 Sinusitis DBQ indicates a similar frequency of recurrence of such symptoms. However, the Board notes that the examiner did not indicate that those symptoms are related to the Veteran’s tonsillitis, and that the examiner did indicate that the Veteran also has a diagnosis of sinusitis. The examiner stated that the Veteran’s tonsils appeared slightly enlarged and mildly red, and that the Veteran complained of tenderness on palpation of his neck, but did not have any acute tonsillitis-related infection. See Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ dated in June 2012. The December 2014 Sinusitis DBQ reflects that the Veteran had active diagnoses of sinusitis and rhinitis at the time of his examination that month and that much of the aforementioned recurring symptoms are related to the sinusitis. The examiner also noted that the Veteran had frequent upper respiratory infections (URIs) in the report of that examination. See Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ dated in December 2014. While neither of these examination reports are very clear with regard to which, if any, of the Veteran’s aforementioned recurring symptoms are related to his tonsillitis, the June 2012 Sinusitis DBQ does clearly indicate that the Veteran did not have any acute tonsillitis infection at the time of that examination and his medical records clearly indicate that those symptoms have been attributed to his sinusitis, rhinitis, and other conditions and not the tonsillitis. Those VA examination reports do, however, indicate that the Veteran’s tonsils were red and inflamed upon examination, at least in June 2012. Considering the above, the Board finds that the preponderance of the evidence indicates that the Veteran’s tonsillitis has caused some redness and inflammation of the Veteran’s tonsils, and perhaps some pain in his throat, but the other recurring symptoms mentioned above are more likely than not attributable to conditions other than the Veteran’s tonsillitis. To the extent that the Veteran contends that his other recurring symptoms (URIs, coughs, fevers, post nasal drip, etc.) are attributable to his tonsillitis, the Board finds that he is not competent to opine on that matter. The issue is medically complex, as a competent opinion as to the cause of such symptoms requires medical training and credentials which the Veteran has not been shown to possess. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007).

Thus, after review of the claims file, including but not limited to the evidence discussed above, the Board finds that the criteria for the 10 percent disability rating under Code 6516 is the best approximation of the character and severity of the Veteran’s current tonsillitis-related symptoms. The Veteran’s tonsils are red and inflamed, and he regularly experiences some discomfort in his throat, and the criteria for a 10 percent disability rating under Code 6516 contemplates hoarseness with inflammation of the cords or mucous membrane. The Board has considered whether any other diagnostic codes provide rating criteria that better approximate the character and severity of the Veteran’s tonsillitis, and the Board finds that they do not. Accordingly, the Veteran is entitled to a 10 percent disability rating for his service-connected tonsillitis, and to that extent only, this claim is granted.

Effective Date

The Veteran also claims entitlement to earlier effective dates for the separate 10 percent disability ratings for his painful and limited motion of his right index and long fingers and thumb.

The general rule regarding effective dates is that the effective date of an evaluation and award of compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase will be the date of receipt of the claim or the date entitlement arose, whichever is the later. 38 C.F.R. § 3.400.

The general rule regarding effective dates of increased ratings is that, except as provided in paragraph 38 C.F.R. § 3.400(o)(2) and 3.401(b), the effective date of an increased rating is the date of receipt of the claim or the date entitlement arose, whichever is later. 38 C.F.R. § 3.400(o)(1). 38 C.F.R. § 3.401(b) relates to additional compensation or pension for dependents and does not apply in this case.

Under 38 C.F.R. § 3.400(o)(2), the effective date of an award of increased disability compensation shall be the earliest date as of which it is factually ascertainable that an increase in disability had occurred, if application is received within one year from such date; otherwise, the effective date will be the date of VA receipt of the claim for increase, or the date entitlement arose, whichever is later. Id.; see also 38 U.S.C. § 5110(a), (b)(2).

The United States Court of Appeals for Veterans Claims (Court) has held that 38 U.S.C. § 5110(b)(2) and 38 C.F.R. § 3.400(o)(2) are applicable only where an increase in disability precedes a claim for an increased disability rating; otherwise the general rule of 38 C.F.R. § 3.400(o)(1) applies. See Harper v. Brown, 10 Vet. App. 125, 126 (1997). Thus, three possible dates may be assigned depending on the facts of the case: (1) if an increase in disability occurs after the claim is filed, the date that the increase is shown to have occurred (date entitlement arose) (38 C.F.R. § 3.400(o)(1)); (2) if an increase in disability precedes the claim by a year or less, the date that the increase is shown to have occurred (factually ascertainable) (38 C.F.R. § 3.400(o)(2)); (3) if an increase in disability precedes the claim by more than a year, the date that the claim is received (date of claim) (38 C.F.R. § 3.400(o)(2)). Harper, 10 Vet. App at 126. 

Thus, determining an appropriate effective date for an increased rating under the effective date regulations involves an analysis of the evidence to determine (1) when a claim for an increased rating was received and, if possible, (2) when the increase in disability actually occurred. 38 C.F.R. §§ 3.155, 3.400(o)(2).

7. Entitlement to effective dates prior to January 22, 2015 for the separate 10 percent disability ratings for painful and limited motion of the right index finger, right long finger and right thumb

The Veteran filed a claim for service connection for right hand trauma on February 29, 2012. See VA Form 21-526b, Veteran’s Supplemental Claim for Compensation received on February 29, 2012. He was granted service connection for limited motion of the right thumb, index finger, and long finger in a rating decision issued by the VA regional office (RO) in Jackson, Mississippi on September 4, 2013. A single 10 percent evaluation was assigned, effective February 29, 2012. The Veteran contacted VA in June 2014 and stated that he wanted to file a claim for TDIU. See VA Form 27-0820, Report of General Information dated in June 2014. That claim for TDIU was treated as a claim for increase of the Veteran’s limited motion of his right thumb, index finger, and long finger. Based on that claim, the Veteran’s disability rating for his right thumb, index finger, and long finger was reconsidered, and he was denied an increased rating for the condition in a February 25, 2015 rating decision. This appeal followed. See VA Form 21-0958, NOD received in May 2015. 

As discussed above, the Veteran was not shown to have limited motion of his right index, right long finger or thumb prior to January 22, 2015. However, he was noted to have pain with movement of his right thumb, ring finger and little finger at the time of his June 2012 VA hand and finger conditions examination. See Hand and Finger Conditions DBQ dated in June 2012; Medical Opinion 2 DBQ dated in June 2012. In this regard, the Board notes that at one point in the June 2012 Hand and Finger Conditions DBQ (section 6c), the examiner indicated that the Veteran had pain on movement of all of the digits on his right hand; however, at another point (section 4a) of that DBQ, the examiner indicated that the Veteran only had limited motion or evidence of painful motion in his right thumb, ring finger and little finger. Further, in the Medical Opinion 2 DBQ, the examiner stated that the Veteran had residual pain on use of his right small (i.e., little) and ring fingers (and implicitly not the other digits).

The Veteran’s medical records do not reflect any limitation of the motion of the Veteran’s digits on his right hand prior to January 2015. In fact, a May 2013 Orthopedic Surgery Note in the Veteran’s VA treatment records reflects that he had full range of motion of all digits except for his thumb. See VA treatment records received in September 2018. Reconciling the slight inconsistencies in the June 2012 Hand and Finger Conditions DBQ and the Medical Opinion 2 DBQ, the Board finds that the preponderance of the evidence reflects that prior to January 22, 2015, the range of motion of the Veteran’s right index finger and right long finger were not limited. Affording him the benefit of the doubt, the Board finds that the range of motion of his thumb was limited during that period, but the previously assigned 10 percent evaluation for multiple digits contemplates that. The claims file does not contain any evidence that, prior to January 22, 2015, there was a gap of more than 1 inch (2.5cm.) between the Veteran’s right thumb pad and fingers when he tried to oppose his thumb to his fingers. To the extent that the Veteran contends that he had any additional pain or any limitation of the motion of his right thumb, index or long fingers before January 22, 2015 other than that discussed here, the Board finds that the aforementioned VA treatment records and the June 2012 VA examination reports/DBQs are more probative than any such contentions by the Veteran. 

Because the Board has found by a preponderance of the evidence that the Veteran’s range of motion of his index and long fingers was not limited, and his motion of those fingers was not painful, he is not entitled to compensable ratings for those fingers prior to January 22, 2015. Therefore, in turn, because the preponderance of the evidence does not weigh in favor of finding that it is factually ascertainable that the Veteran was entitled to separate compensable ratings for his index and long fingers prior to January 22, 2015, the Board finds that he is not entitled to an effective date prior to January 22, 2015 for his separate 10 percent disability ratings for his painful and limited motion of his right index finger, right long finger and right thumb. Accordingly, the claims for those benefits are denied.

Service Connection

The Veteran also claims entitlement to service connection for sinusitis.

8. Entitlement to service connection for sinusitis

Service connection may be granted for a disability resulting from disease or injury incurred or aggravated during active service. 38 U.S.C. § 1110. Generally, service connection requires (1) the existence of a present disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a causal relationship (nexus) between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163 (Fed. Cir. 2004). Without evidence of disease or injury during service, service connection may still be granted if all of the evidence, including that pertinent to service, establishes that the disability was incurred in service. See 38 C.F.R. § 3.303(d).

The Veteran claims that he has sinusitis and that it was incurred while he was on active duty and caused by his active duty service. See, e.g., VA Form 21-0958, NOD received in May 2015. The Veteran’s service treatment records (STRs) reflect in-service complaints of sinus problems, but they do not reflect any diagnosis of chronic sinusitis. February 2009 and May 2010 notes in the Veteran’s private treatment records indicate that he does have sinusitis, however. See, e.g., private treatment records received on March 11, 2011. However, none of the Veteran’s medical records show any indication by any third party (i.e., someone other than the Veteran) that his sinusitis began during or is related to his active duty service. 

The Veteran was afforded a VA examination in June 2012, and the examiner indicated that the Veteran had been diagnosed with chronic sinusitis in 1996 or 1997; however, the examiner seemed to indicate, at least implicitly, that the Veteran’s sinusitis was not incurred during his active military service since a sinus x-ray that was performed in July 2012 in connection with the examination showed that the Veteran’s sinuses were normal. See Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ dated in June 2012. 

Another VA examination opinion was obtained in January 2013, and the examiner that provided that opinion opined that it is less likely than not that the Veteran’s sinusitis is related to his service since there were no findings of sinusitis during the Veteran’s service and the results of the July 2012 sinus x-ray were normal. See Compensation and Pension (C&P) Examination Report dated in January 2013. 

The Veteran was afforded yet another VA examination for his claimed sinusitis in December 2014, and the examiner who completed that examination indicated that the Veteran was diagnosed with chronic sinusitis in 2014 and that it is less likely than not that the Veteran’s sinusitis is causally linked to the Veteran’s service. The rationale was once again that the Veteran’s July 2012 sinus x-rays were normal. See Sinusitis, Rhinitis and Other Conditions of the Nose, Throat, Larynx and Pharynx DBQ dated in December 2014; Medical Opinion DBQ dated in December 2014. 

As mentioned above, the Veteran contends that his sinusitis began during and was caused by his active duty service, but the Board finds that the Veteran is not competent to opine on the etiology of his sinusitis. The issue is medically complex, as a diagnosis and a competent opinion as to the etiology of such a condition requires medical training and credentials which the Veteran has not been shown to possess. See Jandreau, supra. Thus, the record does not contain any competent evidence that the Veteran’s sinusitis began during his active duty service or resulted from an in-service event, injury or disease. However, the record does contain competent evidence, in the form of the reports from the June 2012, January 2013 and December 2014 VA examinations, that there is no nexus between the Veteran’s sinusitis and an in-service event, injury or disease. Therefore, the preponderance of the evidence weighs against a finding that there exists a nexus between the Veteran’s sinusitis and his active duty service. As such, the Veteran is not entitled to direct service connection for sinusitis.

The Board has also considered the Veteran’s entitlement to service connection for sinusitis under 38 U.S.C. § 1117 and 38 C.F.R. § 3.317. However, in a December 2014 Gulf War General Medical Examination DBQ, a VA examiner opined that the Veteran’s sinusitis was not an undiagnosed illness or a medically unexplained chronic multi-symptom illness. See 38 C.F.R. § 3.317(2)(i). There is no evidence to the contrary in the claims file. There is no other basis for service connection for sinusitis under 38 U.S.C. § 1117 and 38 C.F.R. § 3.317. For these reasons, the Board finds that the preponderance of the evidence weighs against finding that the Veteran’s sinusitis is an undiagnosed illness, a medically unexplained chronic multisymptom illness defined by a cluster of signs or symptoms, or a diagnosed illness that the Secretary of VA has determined in regulations prescribed under 38 U.S.C. § 1117(d) warrants a presumption of service-connection. See 38 U.S.C. § 1117.

Accordingly, the Board finds that the Veteran is not entitled to service connection for sinusitis, and his claim must be denied.

REASONS FOR REMAND

1. Entitlement to service connection for sleep apnea

The Veteran has claimed that his sleep apnea was caused or aggravated by his service-connected tonsillitis. A VA examination opinion has not been obtained addressing this contention. Given the Veteran’s contentions, the Board finds that this constitutes a duty to assist error under 38 C.F.R. § 3.159(c)(4) which existed at the time of the appealed September 2018 RAMP rating decision. On remand, the Veteran should be afforded a VA examination opinion for the purpose of determining whether his sleep apnea was caused or aggravated by his tonsillitis.

2. Entitlement to service connection for arthritis of the right knee is remanded.

The Veteran claims that he has arthritis in his right knee that was incurred during or resulted from an in-service event, injury or disease. However, veterans are not expected to identify the exact diagnosis that they are claiming benefits for. A December 2012 Orthopedic Surgery Note in the Veteran’s VA treatment records reflects that an MRI of the Veteran’s right knee revealed that he had a small intrasubstance tear of the anterior cruciate ligament at its attachment to the tibial spines with an adjacent sprain and tendinopathy or a remote injury to the distal quadriceps tendon. See VA treatment records received in September 2018. Considering these findings, the Board finds that the Veteran should be afforded another VA examination for the purpose of determining (a) whether he has had any knee conditions other than chondromalacia of the right patella during the period on appeal (i.e., since February 18, 2011) and (b) the etiology of any such other knee conditions. The examiner should be asked to review and consider the Veteran’s medical records, including the aforementioned Orthopedic Surgery Note, when forming his or her opinion on those matters. The Board finds that the current absence of such an examination constitutes a duty to assist error under 38 C.F.R. § 3.159(c)(4) which existed at the time of the appealed September 2018 RAMP rating decision. 

3. Entitlement to service connection for right hip strain is remanded.

The Veteran has submitted a letter from a private nurse and physician indicating that his right hip strain could be due to weakness and instability of his service-connected right knee. He was afforded VA examinations for the purpose of determining the etiology of his claimed right hip condition in September 2011 and July 2013. The reports of both of those examinations indicate that the examiners did not review the Veteran’s claims file. This constitutes a duty to assist error under 38 C.F.R. § 3.159(c)(4), again one which existed at the time of the appealed September 2018 RAMP rating decision. The Veteran should be afforded another VA examination for his right hip strain, and the examiner that performs the examination should review the Veteran’s claims file before rendering another opinion as to the etiology of the Veteran’s right hip strain.

4. Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected disabilities prior to August 6, 2015 is remanded.

The issue of entitlement to TDIU is inextricably intertwined with the other issues being remanded herein. As such, it must be remanded, too, pending completion of the other development directed herein and readjudication of the other remanded issues.

The matters are REMANDED for the following action:

1. Afford the Veteran a VA examination, with an appropriate examiner who has reviewed the claims file, to address the etiology of the claimed sleep apnea. Specifically, the examiner should address whether the sleep apnea was at least as likely as not (a 50 percent or greater probability): a) a result of service, or b) caused or aggravated by the service-connected tonsillitis. All opinions must be supported by a rationale. 

2. Schedule the Veteran for a VA examination by an appropriate clinician to determine the nature and etiology of any: (a) right knee conditions other than the Veteran’s chondromalacia of the patella of the right knee; and (b) right hip conditions. The examiner must opine whether each such condition is at least as likely as not related to an in-service injury, event, or disease, including any in-service knee or hip injuries.

The examiner should also opine whether any such right knee or right hip conditions at least as likely as not (1) began during active service, (2) manifested within 1 year after discharge from service, or (3) was noted during service with continuity of the same symptomatology since service.

The examiner should also opine whether any such right knee or right hip conditions are at least as likely as not (1) proximately due to the Veteran’s service-connected chondromalacia of the patella of the right knee, or (2) aggravated beyond its natural progression by his service-connected chondromalacia of the patella of the right knee.

All opinions must be supported by a rationale. 

 

A. C. MACKENZIE

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD C. Banks, Associate Counsel